UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Thomas James Erickson,

Plaintiff,

vs.                                                                REPORT AND RECOMMENDATION

United States Post Office, and
Ione Smischney, Kalene Schultz,
Natalie Sorvari, Marilyn Doe, as
postal employees,

Defendants.            Civ. No. 06-186 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Plaintiff's Petition for a Temporary Restraining Order or for a Writ of Mandamus, and the Government's informal Motion to Dismiss for want of subject matter jurisdiction.  A Hearing on the Petition was conducted on February 2, 2006, at which time, the Plaintiff appeared on his own behalf, and the Defendants appeared by Mary J. Madigan, Assistant United States Attorney.  For

reasons which follow, we recommend that the Petition for equitable relief be denied, and that the Petition be dismissed, without prejudice, for lack of subject matter jurisdiction.

## II.  Findings of Fact

The Plaintiff temporarily resides, when in the State of Minnesota, in a cabin owned by his mother,[1] which is located at 54277 Sheephead Road N.E., in Waskish, Minnesota.   Mail delivery at that address is conducted by the United States Post Office in Kelliher, Minnesota, while the Post Office in Waskish maintains Post Office Boxes, which can be rented, as well as providing "General Delivery" for those transient postal patrons who qualify for that service.   For some time, mail has either been delivered to a mailbox, which the Plaintiff mounted on a 911 sign next to Sheephead Road, in the front of his residence, or has been retrieved by the Plaintiff from "General Delivery" at the Waskish Post Office.

In September of 2005, postal officials informed the Plaintiff that delivery along Sheephead Road was being discontinued because that was not a proper route, and delivery along that Road had been in error.   Apparently, for some portion of that

---

[1]For ease of reference, hereinafter we refer to the residence as that of the Plaintiff, recognizing that the ownership of the residence does not rest in the Plaintiff.

Road, the contract mail carrier had to traverse private property, which the Post Office found unacceptable.  In addition, a change in the Postmaster at the Waskish Post Office resulted in new procedures which were required by the Postal Regulations.  Of particular importance, here, the new Postmaster, consistent with the Postal Regulations, would no longer allow postal patrons to designate their mail as "General Delivery" for a period in excess of thirty (30) days.  As a consequence, postal officials informed the Plaintiff that he could no longer retrieve his mail, as "General Delivery," at the Waskish Post Office.  Rather, the Plaintiff was counseled to either rent a Post Office Box at the Waskish Post Office, or erect a mailbox along Eagle Nest Drive N.E., which also adjoins the Plaintiff's residence, but in back of that residence, instead of in front, as had been the case with the mailbox along Sheephead Road.  The Plaintiff chose not to follow that advisory, and he was informed, in December of 2005, that, if he did not rent a Post Office Box, or change the location of his mailbox to Eagle Nest Drive, then his mail would be returned to its sender.  The Plaintiff did not undertake either type of corrective action, did not contact the local postal officials, at Waskish, or Kelliher, in order to determine if other remedial action would be available to him, but rather, he filed his Petition for Injunction/Restraining Order.  See, <u>Docket No. 1</u>.

In support of his Petition, the Plaintiff underscores that his legal mail has been interrupted, by the postal officials, and has been returned to its sender, which has exposed him to potential sanctions, including possible incarceration, for failing to appear at Court functions, or in failing to respond to Court directives.   In the Plaintiff's view, the actions of the postal officials have been motivated by animus toward him, and by an interest in frustrating various legal actions, or defenses, that he is pursuing.  The Defendants do not dispute that the policy of returning the Plaintiff's mail to its sender has interrupted his ability to receive mail, including Court-issued mail. See, <u>Plaintiff's Exhibits 1, 1A, 2, 3 and 4</u>.

Indeed, the docket entries for this file reflect that our Clerk of Court's transmittal of legal materials to the Plaintiff were returned to the Clerk, on January 23, and 25, 2006, with notations of "No Such Address," or "Not Deliverable as Addressed - Unable to Forward," respectively.  See, <u>Staff Notes for January 23, and 25, 2006</u>.  As a result, the individual Defendants have not been served with process, as the papers being forwarded to the Plaintiff were preparatory to effecting such service.  The Plaintiff argues, at least as we have indulgently construed his argument, see, <u>Wishnatsky v. Rovner</u>, 433 F.3d 608, 610 (8th Cir. 2006), citing <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972), that the Defendants' denial of mail service to him constitutes

a denial of access to the Courts. In turn, the Defendants contend that they have committed no constitutional violations, and that the Court is without jurisdiction to consider the Plaintiff's request for injunctive relief.

At the time of the Hearing, the Court heard testimony from the Plaintiff, from Ione L. Smischney ("Smischney"), who is the Postmaster of Kelliher, Minnesota, from Kaylene S. Schultz ("Schultz"), who is the Postmaster of Waskish, Minnesota, and we watched a videotape of the roadways around the Plaintiff's residence, see, Plaintiff's Exhibit 7, and audited a compact disk of a conversation between the Plaintiff and Marilyn Miller ("Miller"), who is a customer service employee of the Postal Service in the Twin Cities.[2] See, Plaintiff's Exhibit 8. The Plaintiff's videotape depicts the roadways, inclusive of both Sheephead Road, and Eagle Nest Drive, on which mail has been delivered in the past. The depictions were both in daylight, and during the nighttime, when the Plaintiff videotaped the route from the Waskish Post Office, and ultimately down Eagle Nest Drive, and up Sheephead Road to the Plaintiff's residence. At one point in his travel down Eagle Nest Drive, the Plaintiff stopped his vehicle in

---

[2]In his Petition, the Plaintiff was unaware of Miller's last name, so he named her as Defendant "Marilyn Doe." Since the filing of his Petition, the Plaintiff has learned that "Marilyn Doe" is Marilyn Miller, and the Defendants do not challenge that fact.

order to videotape the area where his property borders on Eagle Nest Drive.  While the

Plaintiff contends that there is a steep embankment leading from his property to the

road, no particular steepness is reflected in that videotape -- at least none that would

pose a hazard to foot traffic.

In addition, the videotape reflects that the Plaintiff's residence is clearly

discernable from Eagle Nest Drive, even in the nighttime, when lights from the house

could be readily seen.  Subsequently, the Plaintiff testified, on cross examination, that

the distance between the house, and Eagle Nest Drive, is about one hundred (100) feet.

During the Plaintiff's narration of the videotape, he pointed out a mailbox, which was

owned by a neighbor, Albert Otto ("Otto"), and which is located on Sheephead Road,

in addition to several other mailboxes.  The Plaintiff believed that mail was still being

delivered to Otto's mailbox.  In addition, the videotape demonstrated that a motor

vehicle could easily travel along Sheephead Road, onto Eagle Nest Drive, without

having to negotiate a dead end, or maneuver dangerously.  The pre-Hearing Affidavit

of Smischney, see, Government's Exhibit 2, had averred that "Sheephead Rd. dead-

ends and has no safe turn-around area" and, upon receiving a copy of that Affidavit,

the Plaintiff videotaped the roadways so as to impeach Smischney's attestation.

The compact disk contains a recorded conversation that the Plaintiff surreptitiously conducted with Miller, when he called her to complain of the actions taken by the postal officials. The Plaintiff particularly highlighted a portion of that conversation, in which Miller informed the Plaintiff that, if he did not rent a Post Office Box, or erect a mailbox on Eagle Nest Drive, his mail would be returned to sender. The Plaintiff then inquired whether the Post Office would return-to-sender mail that had been sent to him by the Eighth Circuit Court of Appeals, and Miller's response was affirmative. The Plaintiff then informed Miller that he would be seeking an injunction. As viewed by the Plaintiff, Miller's comment reflected an intention to thwart communication between the Plaintiff and the Court of Appeals.

As a part of his presentation, the Plaintiff called Smischney to testify. Smischney was asked about her husband, Gerald R. Smischney ("G. Smischney"), who owns and manages Walden's Store, which sells sporting goods, inclusive of hunting and fishing licenses, to outdoors enthusiasts. Apparently, the Plaintiff had been prosecuted for some licensing offense, which was never fully disclosed in the evidence, and which was not known to Smischney, who testified that she is not involved in the operation of that store. Notably, G. Smischney is the Plaintiff's first cousin and, apparently, in the company of his wife, G. Smischney has socialized with

the Plaintiff on several occasions. At one point, Smischney was questioned as to whether she knew that the Plaintiff came to Minnesota in order to consult on medical problems at the Mayo Clinic. Smischney denied any such knowledge, but did recall the Plaintiff telling her, and her husband, that he came to Minnesota because it was "too hot" for him in Michigan because of his other lawsuits.

The Plaintiff also questioned Smischney about the discontinuance of mail delivery along Sheephead Road. Smischney testified that Sheephead Road was abandoned for mail delivery because of conflicts with the Olson property owners. Apparently the Olsons maintain a photography business, and use their property as a backdrop to their photographs. As related by Smischney, in order for Sheephead Road to merge with Eagle Nest Drive, the Olsons' private property has to be traversed, and the Post Office only delivers mail on publicly maintained roadways. When questioned as to why her Affidavit averred that Sheephead Road "dead ends," Smischney responded that, in Post Office parlance, delivering mail on Sheephead Road would result in a "dead end retrace," as the contract carrier could not cross Olson's private property. She further related that, as a cost savings measure, the Post Office avoids "retraces."

Smischney also testified that Otto does not have mail delivered to his mailbox on Sheephead Road, but instead picks up his mail from a Post Office Box at the Waskish Post Office, and that other residents erect mailboxes to lend the impression that they are year-round residents.  While she agreed that the County's 911 sign, for the Plaintiff's property, was located on Sheephead Road, which suggested a residential address for that house on that Road, she noted that the Post Office is not involved in the 911 designations.  Smischney further testified that, if the Plaintiff was dissatisfied with the discontinuance of mail delivery on Sheephead Road, he could file a petition to have the mail re-delivered along that route.  She was firm that the Plaintiff could not expect to maintain a "General Delivery" address at the Waskish Post Office, as such delivery is an added expense to the Postal Service, and is intended only for transients, and only for a period of thirty (30) days.  Otherwise the Plaintiff could rent a Post Office Box or, if he qualified, he could be allotted an "e-box" for free. According to the Record presented, an e-box is allowed for those residents who are well removed from the mail delivery routes.  As related by Smischney, maintaining ten (10) to twelve (12) "General Deliveries" at the Waskish Post Office, which apparently was the past practice, proved to be a burden.

- 9 -

Following the Plaintiff's cross examination of Smischney, she was questioned by counsel for the Government.  Smischney testified that she has been a Postmaster for twenty-six (26) years, and has been the Postmaster at the Kelliher Post Office for thirteen (13) years.   Smischney introduced a map of the area, which depicts the roadways in question.  See, <u>Government Exhibit 3</u>.  As recounted by Smischney, the roadways were somewhat recently named, and several of the roadways were added, altered or eliminated, owing to an expansion of a nearby airfield.  While Government Exhibit 3 purports to depict the location of mailboxes, Smischney stated that those were County designations which did not match the contract routes maintained by the Post Office.

Smischney testified that, on September 29, 2005, during a review of the postal routes, there were questions raised by the contract carrier, and it was determined that Sheephead Road was not a proper route.  Other than the Plaintiff, no one else was delivered mail on that Road in September of 2005.  Smischney testified that she made the decision to discontinue deliveries on Sheephead Road, and she did so because of the absence of a proper route.  Smischney described her relationship with the Plaintiff as having been cordial until he commenced this lawsuit.

Smischney also testified to the options that were available to the Plaintiff, after he was told that mail would no longer be delivered along Sheephead Road. He could move his mailbox to Eagle Nest Drive; he could petition for a return of delivery to Sheephead Road; or he could rent a Post Office Box. Smischney testified that a small box could be rented for $26.00 a year, and such a box would accommodate most mailings, while extra-large envelopes would be held at the Post Office window, following the placement of a notation advising the box holder of the need to retrieve the oversized letter. An e-box was also possible but, in order to qualify, there could be no alternate place to erect a mailbox.

On recross examination, Smischney testified that the next larger Post Office Box would rent for $38.00 a year, and one that would hold a number of large legal-sized envelops would rent for $70.00 a year. As recounted by Smischney, if the Plaintiff were not able to erect a mailbox on Eagle Nest Drive, "we would have worked it out." She related that she tries to be "flexible," and that Schultz had offered to rent the Plaintiff a Post Office Box, at the Waskish Post Office, for six (6) months, and Smischney would have worked with that. She also testified that, on occasion, she allowed postal patrons to rent the next larger size of Post Office Box at no additional charge, because of the volume of mail, and upon a showing of need.

Next, the Plaintiff was called for cross examination.  He testified that he has not had regular employment in Minnesota, but has performed work sporadically.  He also testified that his mother's property was three (3) lots wide.  He confirmed that he was told, in September of 2005, that he would have to move his mailbox to Eagle Nest Drive, or rent a Post Office Box.  He testified that, in 2004 and 2005, he was retrieving his mail from General Delivery in Waskish.  As to moving his mailbox, the Plaintiff stated that he was unable to do so because he did not have the money to buy lumber, and could not afford to move the box.  In addition, he did not have the time to move the mailbox, as he was "defending against different lawsuits."  He further testified that he could not afford to pay "$100.00 a year" in order to rent a Post Office Box, as he was already borrowing money from relatives in order to survive.  Moreover, he did not know how long he would remain in Minnesota, and did not believe he could get a refund on the Post Office Box, and money was "hard to come by."  In addition, the Plaintiff confirmed that he has not pursued any remedy, or any other course of action for the receipt of his mail,  other than to commence this lawsuit.  The Plaintiff testified, on redirect, that he was never informed of the other options, and that he needed to get his mail in order to retain his freedom.

Lastly, the Plaintiff called Schultz to testify. She stated that she knew the Plaintiff from her work at the Waskish Post Office, and had no prior contact with him. She found out who he was about two (2) years ago in April. At that time, she and her husband were awakened at 2:00 o'clock a.m., by gunshots, and she reported that to the police. See, Plaintiff's Exhibit 5. Apparently police officers came to the scene and, with spot lights, located the Plaintiff. Subsequently, charges were filed against the Plaintiff, but those charges were dismissed. Schultz testified that the only reason she telephoned law enforcement was because she was scared.

Thereafter, in July of 2003, Schultz reported observing the Plaintiff erecting a mailbox at the exact location where he had been arrested on a firearms violation. See, Plaintiff's Exhibit 6. Schultz testified that she made the inquiry with law enforcement, as she wanted to know why the mailbox was erected, and why the land was being altered, and cultivated, when the property belonged to the County. She stated that she had no animosity toward the Plaintiff, and thought that they "got along fine."

Schultz then testified on direct examination. She has been the Postmaster at the Waskish Post Office since October of 2004. Waskish has approximately thirty-three (33) residents who have deliveries on a route, and forty-five (45) who rent Post Office Boxes. After she assumed that position, she determined that there were several people

who were on General Delivery, and who should not have been. When those people came into the Post Office, they were advised to rent a Post Office Box, or put up a mailbox on their property, as you could only be on General Delivery for thirty (30) days. Schultz admitted that, originally, she had informed the Plaintiff to erect a mailbox on Sheephead Road, as the contract carriers believed, at that time, that Sheephead Road was a delivery route. However, Smischney conducted a route inspection, and informed Schultz that Sheephead was determined not to be a proper mail route. Thereafter, Schultz informed the Plaintiff that he had to move his box to Eagle Nest Drive, and suggested that he check with the Olsons to see if they would agree to allow his mailbox to be erected near their own.

Schultz testified that, on December 27, 2005, Cindy Smischney ("C. Smischney") informed the Plaintiff that he could either rent a Post Office Box, or move his mailbox to Eagle Nest Drive. In response, the Plaintiff told her that he did not know how the Postal Service could take a road off of a route map. Schultz further testified that she did not make the decision to return the Plaintiff's mail to its sender on January 20, 2006, as that decision was made by Miller, and by Schultz's supervisor in Duluth.

On further cross examination, Schultz denied that C. Smischney had informed the Plaintiff that he could not have General Delivery because he had lived in Minnesota

longer than six (6) months, as C. Smischney had denied that statement.  As to the returning of his mail, Schultz stated that she had been instructed to return his mail starting on January 17, but she awaited three additional days to do so.  She also denied that the Plaintiff had ever informed her about his pending legal matters, although she recalled his telling her about his knee problem, and she referred him to her doctor, and provided him with a novocaine patch on one occasion.  She added that the problem with the Plaintiff's mail delivery could have been solved easily without going to the extreme that the Plaintiff has pursued.

### III.  Discussion

This "tempest in a teapot" is of the Plaintiff's own making.  He was provided with adequate notice of the need to find an alternative to his receipt of mail by either General Delivery, or at his mailbox on Sheephead Road.  He chose to do nothing, other than to commence this lawsuit.  The evidence demonstrates that, for two (2) dollars a month, he could have his mail delivered to a Post Office Box, and that the term of that rental could be for a period of six (6) months.   While the Plaintiff questioned Smischney on the cost of the largest Post Office Box, he represented to the Court, during his opening statement, that he does not "get a lot of mail," from which we reasonably infer that there could be no rational expectation that he would

have to expend, as he argued at the Hearing, one hundred (100) dollars a year on the rental of a box.  To the extent that the Plaintiff contends that he could not afford the lumber to place a mailbox on Sheephead Road, we are unpersuaded.  The Plaintiff has access to three lots containing trees, whose service in supporting a mail box would be without much cost.  Equally unconvincing is the Plaintiff's protestation that the placement of a mailbox, on his own property which abuts Eagle Nest Drive, would cause him to descend a steep embankment.  We saw no such danger exposed in his own videotape and, even if such a hazard presented itself, traveling by car to a mailbox on Eagle Nest Drive would be far less expensive, and time consuming, than driving to the Waskish Post Office to retrieve his mail.

Nor do we find any credible evidence that the decision, by Miller, to return the Plaintiff's mail to its sender, was motivated by ill-will, or as some form of retaliation because of the Plaintiff's past lawsuits against others.  Neither Smischney, nor Schultz, expressed any animosity toward the Plaintiff, and each was confident that a solution could be worked out had the Plaintiff approached them with questions, or with a request for assistance.  The Plaintiff appears to taint Schultz as vindictive because she reported concerns for her personal safety to law enforcement, a right shared by all citizens in a free society.  In short, the Record is bereft of any suggestion, much less

- 16 -

any evidence, that anyone on Sheephead Road is being treated differently than the Plaintiff.

For whatever reason, the Plaintiff would rather start a lawsuit than seek an amicable resolve to his legitimate interest in receiving his mail.  If, as the Plaintiff contends, his need for his mail is tantamount to his own personal freedom from incarceration, or loss of rights, we would have thought that he would have exhausted all informal means to assure the uninterrupted delivery of the mails, rather than to commence a plainly frivolous lawsuit.  As counsel for the Defendants has characterized the matter, this truly is a lawsuit which seeks to prevent the Plaintiff from having to retrieve his mail from a mailbox that is located one hundred (100) feet behind his residence, rather than from a mailbox which is an undisclosed distance in front of his residence.

"In determining whether to grant a preliminary injunction a court considers (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest."  Emerson Electric Co. v. Rogers, 418 F.3d 841, 844 (8th Cir. 2005), citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d

109, 114 (8th Cir. 1981).   "A preliminary injunction is an extraordinary remedy, see

Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987),

and the burden of establishing the propriety of an injunction is on the movant."

Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003), citing Goff v. Harper, 60

F.3d 518, 520 (8th Cir. 1995).   "Failure to show irreparable harm is an independently

sufficient ground upon which to deny a preliminary injunction."   Id., citing Adam-

Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996).   "When there is

an adequate remedy at law, a preliminary injunction is not appropriate."   Id., citing

Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th

Cir. 1989).

Of course, "an injunction cannot issue if there is no chance of success on the

merits * * *."   Mid-America Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972

(8th Cir. 2005), citing Firefighters Local Union No. 1784 v. Stotts, 457 U.S. 561, 589

(1984)(O'Connor, J., concurring), and AM General Corp. v. DaimlerChryler Corp.,

311 F.3d 796, 804 (7th Cir. 2002).   Here, the Plaintiff's action is frivolous, and has no

chance for success on its merits.   While the Plaintiff could abstractly argue the

presence of irreparable harm, which would arise from a total inability to receive mail,

the fact of the matter is that several, reasonable alternatives in securing his mail are

available to him.  Even if, as the Plaintiff proclaims, he is unable to employ waste timber so as to erect a mailbox on Eagle Nest Drive, or is unable to afford a total of thirteen (13) dollars, over a period of six (6) months, the possibility of an e-box presents itself.  We find no irreparable injury here, except to the extent that it has been, or will be, self-imposed by the Plaintiff, himself.

Moreover, for reasons we now turn to, we conclude that we are without subject matter jurisdiction to grant injunctive relief, under the circumstances presented here, because we lack subject matter jurisdiction to do so.  For these purposes, we assume, without deciding, that some level of curtailment of the mail could rise to a constitutional violation.  To cite but one example, for an incarcerated person, the Courts have recognized that a deprivation of mail service can, under certain circumstances, violate that inmate's constitutional right of access to the Courts.  See, e.g., <u>Cody v. Weber</u>, 256 F.3d 764, 767-69 (8th Cir. 2001); <u>Lewis v. Casey</u>, 518 U.S. 343, 354-55 (1996).  Here, however, the Plaintiff's right to receive mail has been conditioned, as it is for all other American citizens, upon the proper placement of a mailbox on an established mail route, or upon an acceptable alternative, such as the rental of a Post Office Box, or an entitlement to an e-box.  He has elected not to pursue any alternative other than an injunction.

At its core, the Plaintiff's complaint concerns the delivery of his mail, as he has no recognized grounds to challenge the Defendants' closure of mail delivery on Sheephead Road as a constitutional deprivation.  Under the Postal Reorganization Act, Title 39 U.S.C. §101, et seq. ("PRA"), the Postal Service is granted considerable discretion in matters concerning the delivery of the mails.  As here pertinent, the PRA provides as follows:

> Interested parties who believe the Postal Service is charging rates which do not conform to the policies set out in this title or **who believe that they are not receiving postal service in accordance with the policies of this title may lodge a complaint with the Postal Rate Commission in such form and manner as it may prescribe.**  The Commission may in its discretion hold hearings on such complaint.  If the Commissioner, in a matter covered by subchapter II of this chapter, determines that complaint to be justified, it shall, after proceeding in conformity with section 3626 of this title, issue a recommended decision which shall be acted upon in accordance with the provisions of section 3625 of this title and subject to review in accordance with section 3628 of this title.  If a matter not covered by subchapter II of this chapter is involved, and the Commission after a hearing finds the complaint to be

> justified, it shall render a public report thereon to the Postal
> Service which shall take such actions as it deems appropri-
> ate.

Title 39 U.S.C. §3662 [emphasis added].

If the decision of the Postal Rate Commisssion relates to matters of permanent rates

and classes of mail -- that is, on matters governed by subchapter II -- then the decision

may be judicially reviewed, as follows:

> A decision of the [Board of] Governors to approve, allow
> under protest, or modify the recommended decision of the
> Postal Rate Commission may be appealed to any court of
> appeals of the United States, within 15 days after its
> publication by the Public Printer, by an aggrieved party who
> appeared in the proceedings under section 3624(a) of this
> title. The court shall review the decision, in accordance with
> section 706 of title 5, and chapter 158 and section 2112 of
> title 28, except as otherwise provided in this section, on the
> basis of the record before the Commission and the Gover-
> nors. The court may affirm the decision or order that the
> entire matter be returned for further consideration, but the
> court may not modify the decision. The court may not
> suspend the effectiveness of the changes, or otherwise
> prevent them from taking effect until final disposition of the
> suit by the court. No court shall have jurisdiction to review
> a decision made by the Commission or Governors under
> this chapter except as provided in this section.

Title 39 U.S.C. §3628.

The fact that certain decisions -- namely, those pertaining to rates and classes of mail

-- are subject to review by a United States Court of Appeals, while decisions of the

- 21 -

Postal Rate Commission concerning proper postal service are not, has convinced many Courts that the latter decisions -- including the delivery of the mails -- are not subject to judicial review.  See, <u>Bovard v. United States Post Office</u>, 47 F.3d 1178, 1995 WL 74678 at *1 (10th Cir., February 24, 1995)("The language of section 3662 makes clear that a postal customer's remedy for unsatisfactory service lies with the Postal Rate Commission, and that Congress did not intend to create a private right of action for service complaints."), cert. denied <u>sub nom.</u> <u>Williams v. United States Post Office</u>, 516 U.S. 834 (1995); <u>Hollander v. United States Postal Service</u>, 1988 WL 138754 at *1 (D. Mass., December 20, 1988); <u>Shelby Resources, Inc. v. Untied States Postal Service</u>, 619 F. Supp. 1546, 1548-49 (S.D.N.Y. 1985); <u>Tedesco v. United States Postal Service</u>, 553 F. Supp. 1387, 1389-91 (W.D. Pa. 1983); <u>Azzolina v. United States Postal Service</u>, 602 F. Supp. 859, 864 (D. N.J. 1985); <u>Village of Niles v. United States Postal Service</u>, 1985 WL 2900 at *4 (N.D. Ill., September 30, 1985).[3]

---

[3]Congress' reluctance to create a private cause of action for every grievance pertaining to mail delivery is not an aberration.  As recognized by our own Court of Appeals, a loss of mail claim is even barred by the Federal Tort Claims Act, Title 28 U.S.C. §2680(b).  Cf., <u>Benigni v. United States</u>, 141 F.3d 1167, 1998 WL 165159 at **1 (8th Cir., April 10, 1998)(affirming District Court's dismissal, without prejudice, of plaintiff's claim that the Postal Service "intentionally withheld his mail from home delivery on numerous occasions, * * * and never delivered to him certain weekly (continued...)

We find the thoughtful, and thorough reasoning of the Court, in <u>Tedesco</u>, which traced the available legislative history of the PRA, and the potential for a private right of action under the required framework of <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975), to be entirely convincing. "Given the extremely limited role for the judiciary provided by Congress in the [PRA], we are certain that the Act has no room for implied rights of action," <u>Tedesco v. United States Postal Service</u>, supra at 1387, and we conclude that, when read together with Section 3628, Section 3662 "provides the sole remedy for a user of postal services who is not receiving adequate service or service equal to that furnished to others." <u>Shelby Resources v. United States Postal Service</u>, supra at 1549. Accordingly, we recommend that the Plaintiff's Petition be dismissed, without prejudice, as we find we are without the requisite jurisdiction over the subject matter of that Petition.[4]

---

[3](...continued)
newspapers."), cert. denied, 525 U.S. 897 (1998).

[4]Even if we concluded that, ultimately, the Court had subject matter jurisdiction, we would still be obligated to recommend a dismissal without prejudice, as the Plaintiff has failed to exhaust the administrative remedies which are available to him. As the Court reasoned, in <u>Dillion v. United States Postal Service</u>, 1995 WL 447789 at *2 (S.D.N.Y., July 28, 1995):

Complaints regarding the Postal Service must first be made

(continued...)

NOW, THEREFORE, It is --

RECOMMENDED:

That the Plaintiff's Petition for Injunction/Restraining Order [Docket No. 1] be dismissed, without prejudice, for want of subject matter jurisdiction.

Dated:  February 3, 2006                 s/Raymond L. Erickson
                                         Raymond L. Erickson
                                         CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

_____

[4](...continued)
         to the Postal Rate Commission.  See 39 U.S.C. §3662
         ("interested persons who believe * * * that they are not
         receiving postal service in accordance with the policies of
         this title may lodge a complaint with the Postal Rate
         Commission * * *").  Because plaintiff has not filed a
         complaint with the Postal Rate Commission, he has not
         fulfilled the procedural prerequisites for a suit against the
         Post Office and his claims against the Government cannot
         be maintained.

The very same may be said here, as the Plaintiff has not exhausted his available remedies before the Postal Rate Commission.  See also, Village of Niles v. United States Postal Service, 1985 WL 2900 at 6 (N.D. Ill., September 30, 1985); Breaux v. United States Postal Service, 46 F. Supp.2d 641, 643 (E.D. Tex. 1999).

- 24 -

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than February 21, 2006,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than February 21, 2006,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.